Ann Y. Oliver v. Commissioner. C. F. Corzelius v. Commissioner.
Ann Y. Oliver v. Commissioner
Docket Nos. 6122, 6123, 12214.
United States Tax Court
1949 Tax Ct. Memo LEXIS 201; 8 T.C.M. (CCH) 403; T.C.M. (RIA) 49102; April 29, 1949
*201 R. B. Cannon, Esq., Sinclair Bldg., Fort Worth, Tex., for the petitioners. D. Louis Bergeron, Esq., and Donald P. Chehock, Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: These proceedings were consolidated for hearing and involve deficiencies in income taxes, as originally determined, as follows: 1941
1943
Ann Y. Oliver
$5,790.70
C. F. Corzelius
9,444.42
$4,719.37 By amendments to his answers and amended answers, the respondent asked for increased deficiencies, to $65,886.07 in the case of Ann Y. Oliver and to $65,777.99 and $50,491.44 for 1941 and 1943, respectively, in the case of C. F. Corzelius. The taxable years 1942 and 1944 are involved because of alleged net loss carry-backs and Current Tax Payment Act of 1943. Petitioner C. F. Corzelius contends that he overpaid his income tax for 1943 by not less than $1,121.47. The evidence, aside from certain admissions of the parties, consists of testimony taken at two hearings, depositions, and many exhibits. The pleadings raised numerous issues. Some of them are not discussed on brief, in view of which it will be assumed that they have been abandoned. The issues remaining for decision will be hereinafter *202 set forth in connection with the opinion on the special facts found for each question. At the hearing held on November 25, 1946, petitioner C. F. Corzelius conceded that the loss of $79,522.82, reported by him in his return for 1943, should be reduced by $33,436.77 on account of a deduction claimed in that amount for loss sustained on notes of the Krome Corporation. On brief he admits that 100 per centum of the gain realized from the sale of a hoist in 1944 is taxable, instead of one-half thereof as reported in his return. These matters will be reflected in the computations to be filed under Rule 50. General Findings The petitioners were married in 1937 and were husband and wife until December 26, 1942, when the wife obtained an absolute divorce. Thereafter she remarried, her present name being Ann Y. Oliver, the petitioner in Docket No. 6122. Petitioners filed their income tax returns for 1941 on the community property basis, with the collector at Austin, Texas, and C. F. Corzelius, hereinafter sometimes referred to as the petitioner, filed his returns for 1942, 1943, and 1944 with the same collector. The petitioners kept their books and filed their returns on the cash basis. Bad *203 Debt Deductions - $250 Findings of Fact In December 1940 petitioner loaned $500 to E. P. Campbell, a resident of Abilene, Texas, and as evidence of the loan received the borrower's note, due June 21, 1941, with interest at 6 per centum per annum. Letters written by petitioner to the borrower after the note matured with regard to payment were returned. Thereafter, petitioner endeavored, without success, to ascertain the whereabouts of Campbell through a bank in Abilene and persons whom he believed would know his address. Later some individuals informed petitioner that Campbell was in destitute circumstances. In their returns for 1941 each petitioner claimed one-half of the loan as a bad debt deduction. The respondent disallowed the deductions upon the ground that no effort had been made to collect the debt and that no proof had been made that the debt was worthless. Opinion Respondent's argument upon brief is to the effect that petitioner has failed to meet his burden of proof. We do not agree with such view of the evidence. Petitioner endeavored, in 1941, but without success, to ascertain the whereabouts of the debtor to collect the debt. Some individuals informed petitioner that *204 Campbell "was absolutely flat broke and didn't have money to eat." Under the circumstances we think the debt became worthless within the year 1941 within the meaning of section 23(k)(1) of the Code and hold that respondent erred in not allowing the deductions. Alimony and Interest Deductions Findings of Fact Petitioner was divorced from his first wife, now Carolyn R. Nelson, in or prior to 1937. Before obtaining the divorce, petitioner entered into a "gentlemen's agreement" with his then wife to pay her amounts of money after their legal separation. No court decree required petitioner to pay her any amount as alimony or for her maintenance. In his returns for the years 1941 to 1944, inclusive, petitioner claimed the following amounts as deductions for payments made to Carolyn R. Nelson: Alimony and
separate
maintenance
Interest
1941 $150
1942
$2,300
100
1943
1,800
75
1944
1,800 The amounts deducted as interest were not disallowed by the respondent in his determination of the deficiencies. In his determination of the deficiency against petitioner for 1943, the respondent disallowed the deduction of $2,300 claimed in 1942. The petitioner reported a net loss of $79,522.82 in 1943. In determining *205 the deficiency for 1943 under the Current Tax Payment Act of 1943, the respondent reduced the amount of the loss to $34,956.88 without itemizing the adjustments made by him. For the year 1944, petitioner reported a net loss of $65,310.03. In determining the deficiency for 1943, the respondent did not allow any net operating loss carry-back deductions. Petitioner alleged as error in the determination of the deficiency for 1943, merely failure of respondent to allow adequate deductions in 1942 for net losses sustained in 1943 and 1944 (so far as here concerned), but upon brief makes no contention that the amount of $1,800 paid in each of the years 1943 and 1944 is deductible in computing net losses for those years. The $2,300 for 1942 was not paid under any court decree or written instrument within section 22(k) of the Internal Revenue Code. Under these facts, the respondent's action in regard to the deductions for alimony will not be disturbed. The issue respecting the deductions taken as interest was raised by the respondent in affirmative pleadings. At the hearing petitioner testified that the payment made in 1941 was not interest and that he was in error in claiming it as a deduction. *206 As to the amounts deducted in 1942 and 1943, petitioner admitted in his reply to the amendment to respondent's answer to the petition that they were not deductible. Accordingly, the deductions allowed by the respondent will be added to income under Rule 50. Interest - Producers Supply & Tool Co. Findings of Fact The Producers Supply & Tool Co., hereinafter referred to as "Producers," is a corporation engaged in the oil well supply business with an office in Fort Worth, Texas. Petitioner had financial transactions with Producers from June 30, 1937, to the close of 1939, on which date he was indebted to it for a balance of $1,903.43 in an open account. In 1938 petitioner needed financial assistance to purchase mining machinery and equipment, which was not handled by Producers. Negotiations with Producers resulted in an understanding, which was embodied in a letter bearing the date of December 29, 1938, reading, in part, as follows: "Referring to our conversation for some machinery which you wish us to purchase and furnish you for Mexico. We are attaching copies of our letters on the equipment you want from Hirsch Brothers at El Paso and engine from Worthington Pump & Machinery Corporation. *207 It is also our understanding that you expect to purchase some used valves, pipe and equipment in Mexico, which you will have Hirsch Brothers buy for you. They will immediately bill us at the cost that you have been able to obtain and we will send them our check. "We will sell you this material at a margin of profit to us of 15% on the selling price. In other words, anything that costs us $850.00 will be sold to you at $1,000.00. 85:850:: 100:X = 85000 /85 or 1000. "Should there be valves, fittings or other material, which we ordinarily handle and which you will need, you are to send us list and we will arrange with the manufacturer to get this to you, as needed. This is intended to cover material that we can purchase at our regular cost and sell to you at the regular prevailing selling price. "You are to pay us for this material in twelve equal monthly payments, covering the total that we furnish you. The first of such payments will be due six months from the date that we pay the first bill; the other payments on each successive 30 days. Interest of 6% per annum is to be charged after 30 days open terms. Account is to be payable in Fort Worth and we will make up notes, after all the *208 material has been furnished, payable as outlined above. "You have the option, if you so desire, to pay for all of this on or before the date the first note would be due. In such event, we will allow a 3% discount from the principal and interest due us." Thereafter petitioner located material he desired to acquire and arranged with the dealers thereof to bill Producers for the selling price agreed upon. Whenever he made such a deal, petitioner advised Producers of the transaction and its terms and the latter would then purchase the material from the dealers at the price agreed upon by the former and sell it to petitioner in accordance with the provisions of the letter of December 29, 1938. None of the equipment and machinery was ever in the possession of Producers. During 1940 and 1941 Producers rendered the following invoices to petitioner for machinery and equipment sold to him under the terms of the letter of December 29, 1938: Invoice
No.
Date
Amount
40096
January 24, 1940
$25,176.50
48063
May 22, 1940
585.90
48588
June 10, 1940
18,264.70
49119
June 12, 1940
2,299.85
57159
November 19, 1940
23,235.28
67128
May 19, 1941
70,588.23
69474
June 19, 1941
47,970.60 The amounts were charged to the open account *209 of petitioner. On April 1, 1940, petitioner executed a series of twelve notes, each for $2,271.64, a total of $27,259.68, maturing monthly, commencing July 25, 1940, in favor of Producers to cover invoice No. 40,096, and the balance of $1,903.43 in the open account on December 31, 1939, plus interest of $179.75. The note balanced the account. Six of the notes, totaling $13,629.84, were paid in 1940 and the remainder were paid on maturity in 1941. On September 16, 1940, petitioner gave Producers a series of twelve notes, each for $1,780.16, except one for $1,780.19 maturing monthly commencing November 16, 1940, for invoices Nos. 48,063, 48,588 and 49,119, and interest of $211.50, a total of $21,361.95, which amount balanced the open account of petitioner. Two of the notes, totaling $3,560.35, were paid in 1940 and the remainder were paid on maturity in 1941. On January 2, 1941, petitioner executed a series of twelve notes, each for $1,936.27, except one for $1,936.31, a total of $23,235.28, maturing monthly commencing May 16, 1941, in favor of Producers for the amount of invoice No. 57159. Eight of the notes, aggregating $15,490.20, were paid on maturity in 1941, and the remainder, *210 $7,745.08, in 1942. On September 30, 1941, petitioner gave to Producers a series of twelve notes, totaling $119,781.20, for the amount of invoices Nos. 67128 and 69474, and interest of $1,222.37 on the open account. The crediting of the notes to the open account balanced the account. The first note in the amount of $9,781.20 was due March 1, 1942, and the remaining notes, each in the amount of $10,000, were due monthly commencing April 1, 1942. The first four notes were paid on maturity. On February 1, 1943, petitioner made a payment of $19,593.36 on principal, and gave two notes bearing 6 per cent interest for the balance of $60,406.64, one of which, maturing June 30, 1943, was in the amount of $25,406.64, and the other, due December 31, 1943, in the amount of $35,000. The first note was paid on June 22, 1944. Of the amount of the second note, $34,227.13 was paid on November 13, 1944, and the remainder in 1945. All of the notes bore interest at the rate of 6 per centum per annum, and such interest, to the date of payment of the notes, was paid by petitioner. Petitioner recorded in his books that the series of notes executed by him on April 1, 1940, September 16, 1940, January 2, *211 1941, and September 30, 1941, included interest in the amount of $3,990.50, $2,739.50, $3,485.28, and $19,006.20, respectively. When payments were made on the notes, petitioner allocated a portion thereof to principal and the remainder to interest. In his return for 1941 petitioner claimed the amount of $21,218.48 as interest paid to Producers. The amount is equal to the sum of $19,006.20, representing interest included in the notes executed on September 30, 1941, and $2,212.28 representing current interest paid to Producers in 1941. In his determination of the deficiencies against petitioners for 1941, the respondent disallowed $14,398.70 of the amount upon the ground that it represented accrued interest, and allowed the remainder of $6,819.78 as interest paid during the year. In his return for 1942, petitioner claimed as, and the Commissioner allowed, deductions for interest paid to Producers the amounts of $2,080.83 and $7,497.16, with an explanation that the latter amount consisted of $1,161.76, representing interest of $290.44 on each of the four payments made on the notes given on January 2, 1941, and $1,583.85 on each of four payments made on the notes executed on September *212 30, 1941, and that the "interest" in the amount of $3,485.28 and $19,006.20 was included in the principal of the series of notes executed on January 2, 1941, and September 30, 1941, respectively, and claimed as a deduction in the return for 1941. In his return for 1943 petitioner claimed as deductions for interest paid to Producers the amounts of $7,537.57 and $7,127.33, with the explanation that the latter represented interest included in payments of $45,000 made in 1943 on the notes given on September 30, 1941. In his determination of the deficiency for 1943, respondent did not disallow any part of the deductions. Petitioner reported a net loss of $65,310.03 in his return for 1944, in connection with which he deducted $5,420.84 for interest paid to Producers. Opinion In their petitions for 1941, petitioners alleged as error the failure of respondent to allow as deductions, interest incurred and paid within the year. They alleged interest payments of $10,254.43, or $3,434.65 in excess of the amount of $6,819.78 allowed by the respondent. The petitions do not disclose the manner of arriving at the additional amount claimed as a deduction. In their brief, filed January 23, 1947, petitioners *213 do not contest the disallowance of $14,398.70 made by the respondent but contedt that aside from the $6,819.78 allowed by the respondent, they are entitled to an additional deduction of $2,212.28 for interest paid. By amendments to his answers, to conform to proof, filed March 11, 1947, pursuant to leave granted at the hearing held on November 25, 1946, respondent alleged as error the allowance of the amount of $6,819.78. In an amendment to his answer in Docket No. 12214, lodged August 25, 1947, and filed February 20, 1948, respondent alleges error in allowing as deductions for interest paid to Producers, the amount of $9,577.99 in 1942 and $14,664.90 in 1943. The year 1944 is involved by reason of petitioner's allegation that he is entitled to a deduction under section 23(s) of the Internal Revenue Code for a net operating loss of $65,310.03 sustained in 1944, in connection with the computation of which loss, he deducted $5,420.84 for interest paid to Producers. Upon brief respondent contends that no allowances should be made for interest, except $1,222.27 in 1944. The primary question under the issues is whether 15 per centum of the amount of the invoices rendered to petitioner by *214 Producers for machinery and equipment acquired under the terms of the letter of December 29, 1938, constitutes interest, as contended by the petitioners, or a handling or service charge, as contended by the respondent. The agreement represented by the letter of December 29, 1938, clearly provides for the purchase of the material by Producers with the usual liabilities of a buyer for payment and the sale thereof to petitioner at a gross profit equal to 15 per centum of the selling price to him. All of the material was acquired by Producers and delivered to petitioner pursuant to the terms of the letter. The ad valorem charge was made without regard to time of payment of the invoices by petitioner. Such charges do not constitute interest on indebtedness. Elverson Corporation, 40 B.T.A. 615; aff'd., 122 Fed. (2d) 295. The only interest to be charged or charged by Producers in connection with the transaction was for failure to pay, within a specified time, balances in the open account and on any notes executed by petitioner in connection with the indebtedness. Petitioner testified that the invoices included amounts for "interest," also that the machinery and equipment was purchased with *215 money advanced to him. Such testimony is contradicted by the terms of the letter of December 29, 1938, and testimony of the officer or employee who signed the letter. He testified that Producers never advanced funds to petitioner and that it bought the material and sold it to petitioner. We conclude that the charge of 15 per centum made by Producers does not constitute interest. Petitioner testified that he paid the amount of $2,212.28 to Producers in 1941 for current interest. The testimony is not only unsupported but conflicts with evidence we regard as more reliable. Accordingly, we decline to accept it at its face value. It does not follow that petitioners are not entitled to any deductions for interest, except $1,222.27 in 1944, as alleged by the respondent. The first series of notes, executed in 1940, included interest in the amount of $179.75 on the open account and the second series, interest in the amount of $211.50. One-half of the former and five-sixths of the latter was paid in 1941 when the notes were paid by petitioner. The series of notes executed on September 30, 1941, included interest in the amount of $1,222.27. The notes, or renewals thereof, were paid in 1943, 1944 *216 and 1945. There will be allowed as a deduction in 1943 and for operating loss purposes in 1944, in the computation under Rule 50, such part of the entire interest as the payments made on the notes each year bear to the total of all of the notes. All of the notes bore interest at the rate of 6 per centum per annum and the interest was paid to the date of payment of each of the various notes. Such interest will be calculated and allowed as a deduction under Rule 50. Inventories - Farm Operations Findings of Fact Petitioner started a ranching business in Colorado during 1936, and thereafter increased the size of his ranch. In 1941 it covered about 13,000 acres. Petitioner used the inventory method in computing income from his ranching business. Before the sale of calves in 1941, he had about 1,200 head of cattle on his ranch. In computing the inventory of cattle on hand at the close of 1941, 1942 and 1943, and prior years, petitioner used the price prevailing in the public sales market at Durango, Colorado, situated a few miles from his ranch, where sales of cattle were made every Saturday. Cows were included in the inventory at the close of 1942 at $70 a head. In his determination of *217 the deficiencies for 1941 respondent adjusted the closing inventory by increasing the amount for 204 head of heifers from $55 to $65 a head. In determining the deficiency for 1943 he adjusted the closing inventory for 1942 by increasing the value of heifers $15 a head and 641 head of cows $10 a head. Opinion The question at issue is whether respondent erred in increasing the value of heifers in the closing inventory for 1941 and the value of cows in the closing inventory for 1942, as set forth in the findings. Section 22 (c) of the Internal Revenue Code provides that when inventories are necessary to clearly reflect the income of a taxpayer, "inventories shall be taken by such taxpayer upon such basis as the Commissioner * * * may prescribe as conforming as nearly as may be to the best accounting practice in the trade or business and as most clearly reflecting the income." Regulations promulgated under the statute provide, in part, as follows: "* * * In order clearly to reflect income, the inventory practice of a taxpayer should be consistent from year to year, and greater weight is to be given to consistency than to any particular method of inventorying or basis of valuation so long *218 as the method or basis used is substantially in accord with these regulations. * * * "The bases of valuation most commonly used by business concerns and which meet the requirements of section 22 (c) are (a) cost and (b) cost or market, whichever is lower. * * *" On brief respondent asks us to sustain his determinations in view of the discretion granted him by the statute and alleged failure of proof on the part of petitioners to overcome his findings. The issue does not involve the right of petitioners to use inventories, or the bases of valuation. Respondent recognized the right and did not disturb the bases used by the petitioners as a method clearly to reflect income. In arriving at values for stock on hand at the close of the years in question, petitioner, as in all prior years, used the price prevailing at a nearby market. Respondent accepted such values for all stock, except the value of heifers in 1942, which is not in controversy, and the values at issue. It does not appear how respondent determined his values or what reason he had for accepting the values petitioner placed on some of the stock and rejecting them as to others. Neither does respondent, on brief, point out in *219 what respect the inventories do not clearly reflect income or otherwise violate his regulations. The inventories appear to have been valued in accordance with the regulations. Accordingly, on these issues we hold for the petitioners. Land Purchase Contract Forfeited Interest - U.S. Chromium, Inc. Findings of Fact In or prior to 1942, petitioner acquired a 50.25 per centum interest in a venture known as "C. F. Corzelius, Agent" to acquire land in the state of Oregon for sale to the U.S. Chrome Corporation, in the event it contained sufficient minerals. Petitioner and the other members of the venture were connected with the corporation. He loaned the venture $70,000, and received a note therefor from the borrower. A total of $15,114.53 was paid to acquire land contracts. The venture also was purchasing a parcel of land known as the Muchow property, from U.S. Chromium, Inc. In 1942 the venture prepared a financial statement of its affairs, disclosing the following: Cash on hand
$ 86.48
Paid on Muchow property
60,962.16
Paid on land contracts
15,114.53
Expenses paid: Interest
$6,067.58
Taxes
2,620.33
Prospecting cost
2,474.52
11,162.43
Received by venture in 1942
$87,325.60
In his return for 1943, petitioner *220 reported capital gain of $46.62, one-half taxable, from the sale by the venture of the Muchow property, and in returns for 1942 and 1943 claimed the following amounts as deductions: 1942
1943
Land purchase contract
forfeited
$7,595.05
$2,606.65
Interest - U.S. Chromium,
Inc.
3,048.96
1,053.04 The interest was not paid by petitioner in cash. The amounts thereof were entered in the books by a journal entry. The credit entry for the amount of $3,048.96 was to "Oregon Land." The accounts of the venture have never been closed. In its return for 1945 the Pantex Oil Corporation claimed the following amounts as bad debt deductions: Note of C. F. Corzelius, Agent
$ 3,216.10
Notes Krome Corporation
89,163.84
Krome Corporation - open account
2,087.89 The explanation was that "The above notes are worthless. Metal Reserve Company refused Krome Corporation a new contract on June 8, 1944." Opinion The deductibility of the losses alleged to have been sustained because of forfeitures of land contracts and interest was raised by the respondent by amendments to his answer. On brief, petitioner does not claim the amount of $2,606.65 as a deduction, and does not discuss the deduction in 1942. Petitioner had a 50.25 *221 per cent interest in the venture and the amount being claimed as a loss in 1942 is such proportion of the amount, $15,114.53, paid by the venture on land contracts in that year. The office manager for petitioner testified that the account for the venture "has not been wound up." We interpret the testimony to mean that the venture is still in existence. Under the circumstances, we are unable to conclude that any part of petitioner's investment in the enterprise was lost in 1942. The amount of interest being claimed as a deduction in 1942 is so much of the interest paid by the venture as is equal to petitioner's interest in the enterprise. Petitioner was on the cash basis of accounting and filed his income tax returns on that basis. No part of the interest in the taxable years was paid in cash or otherwise by petitioner. The interest was paid by the venture. We are not aware of any statute authorizing members of a venture to deduct such expenses from their individual gross income. See Hiram C. Wilson, 17 B.T.A. 976. On these issues, we hold for the respondent. Loss - F. M. C. Power Plant Option Findings of Fact In their income tax returns for 1941 each petitioner claimed $2,505.15 as *222 a loss designated as "F.M.C. Power Plant Option Not Exercised." The initials "F.M.C." are the initials of F. M. Cornelius, a brother and business associate of petitioner. In his determination of the deficiencies for 1941, respondent held that the loss was a short-term capital loss, under provisions of section 117(g)(2) of the Internal Revenue Code, and disallowed the deductions in the absence of any short-term capital gains. Opinion Petitioners alleged as error the disallowance of the deductions. On brief, they ask for no findings and make no argument in support of their claims. However, they have not abandoned the issue. In their petitions, petitioners alleged that the $2,505.15 represented a down payment on the purchase of mining machinery and that petitioners' rights under the contract were forfeited during 1941 because of failure to make further payments. Such allegations of fact were denied by the respondent in his answer. In an amended answer to conform to proof, respondent alleged that no loss was sustained, based upon certain facts, all of which, in the absence of a reply by petitioner, must be treated under the Rules as denied. The mere description of the transaction in the *223 returns in not enough to make a finding that the alleged loss was sustained by the non-exercise of an option. The allegations of the petitioners indicate that petitioners now rely on loss under a contract of sale rather than an option to purchase. There is no evidence here of a contract of sale. Accordingly, on the issue raised by petitioners we sustain the respondent's action in disallowing the deductions. The grounds for respondent's present view is that the transaction was with petitioner's brother and could not result in a deductible loss under section 24(b)(1)(A) and 2 (D) of the Internal Revenue Code, which provision denies, as deductions, losses sustained in sales of property between brothers. The matter raised by respondent is no more in the final analysis than another ground for denying the deduction. There is no proof that the transaction was with a brother of petitioner, the appearance of the initials of a brother in petitioner's description of the loss in his return not being proof that the transaction was with a brother of petitioner. Thus, if we were to treat respondent's pleading as an issue, we would be compelled to hold against him for lack of proof. Loss on Sale of *224 Ranches Interest Paid to Ann Y. Corzelius Findings of Fact In about 1934 petitioner acquired his first ranch, the Granite Peaks Ranch, located near Durango, Colorado. Thereafter, from 1938 to 1943, inclusive, he acquired other nearby ranches known as the Harmon Scheetz, Charlie Scheetz, O'Neill Park, Bay or Bayfield, Ferguson, Yellow Jack, Camp and Wommer. Petitioner borrowed $9,000 on June 1, 1943, from his former wife, Ann Y. Corzelius, to purchase the Wommer ranch. Petitioner spent about $40,000 prior to his marriage in 1937 for improvements on the ranches. No improvements were made on the Wommer and Ferguson ranches. The return of petitioner for 1938 reported a balance of $59,756.70 in depreciable farm equipment and improvements at the close of 1937. The 1938 and subsequent returns disclose additions to the account in the amount of $34,670.77 in 1938; $22,664.31 in 1939; $9,024.26 in 1940; $5,122.68 in 1941; and $326.40 in 1942. The books of petitioner, opened January 1, 1939, disclose a cost of $162,014.01 for ranches. Petitioner's books disclose that the cost of improvements and equipment on the ranches, less depreciation, to the time they were disposed of, as hereinafter related, *225 was as follows: Buildings
$57,894.22
Fences and bridges
6,564.14
Hydroelectric plant
4,604.39
Irrigation ditches and equipment
8,448.26
Communication system
443.05
Furniture and fixtures
18,575.53
Autos, trucks and tractors
2,393.60
Tools and machinery
374.51
Saddles and harness
108.94
Total
$99,406.64 From 1938 to 1941, inclusive, the operations of the ranches were reported in returns filed by the petitioners on the community property basis. In his return for 1938, petitioner claimed as a fire loss on the guest house on the Granite Peaks ranch, and furniture and fixtures therein, treated as separate property, the amount of $2,419.57, representing cost, less depreciation and insurance recovered. On June 1, 1942, petitioners entered into a separation agreement in which petitioner acknowledged the following principal amounts of indebtedness to his wife: Advances out of separate property
for personal use, open account
$ 37,000.00
Note dated January 1, 1941, due Jan-
uary 1, 1944
159,450.14
Note dated June 1, 1942, due January
1, 1944
13,000.00
Total
$209,450.14
Petitioner agreed in the instrument to pay the advances in installments of $1,000 on August 1, 1942, and a like amount each month thereafter for seventeen *226 months and the balance of $19,000 on March 1, 1944. Installment payments were to be without interest if paid on or before maturity, but at 6 per cent interest if not paid until after they were due. The instrument recites that the two notes were secured by a deed of trust lien on certain ranch properties standing in petitioner's name and situated in Colorado, and by a pledgee's lien on two notes signed by the Pantex Oil Corporation on June 1, 1938, which pledgee's lien the wife released in the instrument, and that all the ranch properties in Colorado and cattle standing in the name of or in the possession of petitioner shall be and remain the separate property of petitioner. As additional security for the payment of the notes, petitioner gave a chattel mortgage lien on all ranch and farming machinery and equipment, including three automobiles, a specified number of various kinds of cattle, all situated on the ranches in Colorado. Petitioner was granted the right to sell the ranches, or any part thereof, at any time at not less than their market price at the time of sale and, in the event of sale, the wife agreed to execute appropriate releases upon payment of the net proceeds of the *227 sale or sales to her. The wife waived and relinquished all of her rights, including dower, in the property designated in the instrument as the separate estate of petitioner, regardless of whether it then constituted community property of the parties. The agreement concluded by providing that it "shall be and constitute a final property settlement and division of community property between the parties and shall be binding on their heirs, executors, administrators and assigns," and that in case of failure of petitioner to pay his indebtedness when due, the recourse of the wife would be by suit against petitioner or by resort to the security for payment of the debts. In a decree signed on December 26, 1942, giving Ann Y. Corzelius an absolute divorce from petitioner, the court approved the property settlement agreement, as supplemented by an agreement made in open court that any income from the property set apart in the settlement agreement to each, prior to and since the date thereof and thereafter accruing, to be the separate estate of the respective parties, as a proper and equitable settlement and divested each party of property rights set over to the other in the agreement. The returns *228 of petitioner for the years 1942, 1943 and 1944 were filed as a single individual. Ann Y. Corzelius was not on January 5, 1944, threatening foreclosure proceedings, but she desired additional security for the debts owed her by petitioner. On January 5, 1944, petitioner executed a bill of sale, in which for a recited consideration of $117,591.57, evidenced by a credit on the note dated January 1, 1941, in the principal amount of $159,450.14, leaving a balance thereon of $41,858.57, he as signed to Ann Y. Corzelius certain described cattle, horses, farm tools and machinery, saddles and harness, automobiles, hay and furniture and fixtures located on the ranches. The consideration, specified for each class of property, $12,000 being listed for hay, aggregated $117,591.57. On the same day petitioner executed an instrument reciting that he was indebted to Ann Y. Corzelius in the amount of $96,769.83, as follows: Balance due on note of January 1,
1941
$41,858.57
Note, June 1, 1942
13,000.00
Note, June 1, 1943
9,000.00
Balance, open account
24,000.00
Accrued interest on all of obligations
8,911.26 and conveying to Ann Y. Corzelius, for a recited consideration of a cash payment of $15,000 and cancellation *229 of the indebtedness, all of his ranch lands in Colorado, and certain lands in State Park Ranch under contract of sale from the State of Colorado, subject, however, to the terms of the contract of sale. In his return for 1944, petitioner claimed as a deduction a loss of $61,879.11 sustained in the sale on January 5, 1944, to his former wife of his ranches. The loss was computed as follows: Cash
$ 15,000.00
Debts cancelled: Account payable
$ 24,000.00
Note payable June 1,
1943
9,000.00
Notes payable
172,450.14
205,450.14
Accrued interest
8,911.26
Note held by State Board of Land
Commissioners of Colorado, as-
sumed by buyer
54,865.14
$284,226.54
Cost: Land
$162,014.01
Improvements, machin-
ery, etc.
$134,419.25
Depreciation
35,012.61
99,406.64
Livestock inventory, December 31,
1943
84,685.00
$364,105.65
On January 5, 1944, Ann Y. Corzelius signed and delivered to petitioner a letter addressed to Mrs. Hugo A. Auler, reading as follows: "I have today closed a deal with Curt on the Colorado property and we have the following gentlemens agreement: That at any time within one year starting January 5th, 1944 to January 5th, 1945 should Curt pay me back all the money I have invested plus operating expenses and other expenses *230 plus six per cent interest I have agreed to deed him the property back. "However should I see fit, within the year, to sell all of the property or even a part of it I also agreed to give him a ten day option to buy. "Please put this away for safe keeping should anything happen to me within this year as it is not for public knowledge and only between Curt and me." On about October 3, 1944, and on numerous occasions thereafter, petitioner informed Ann Y. Corzelius that he was ready to pay to her all amounts necessary to redeem and reacquire the assets transferred to her on January 5, 1944. In 1946 petitioner filed suit against Ann Y. Corzelius, then Ann Y. Oliver, and her husband, praying, among other things, that the court determine the amount payable to obtain reconveyance of the property transferred and conveyed on January 5, 1944, and, after such determination, that a judgment be rendered directing the defendants to reconvey and redeliver to him all of the property. In his petition instituting the suit, petitioner alleged, in effect, that the property was transferred on January 5, 1944, to comply with a request of his former wife for better security for his debts to her; that $15,000 *231 was advanced to him by her to place him in a position to transfer the property; and that at the time of the transaction an understanding was reached that he could obtain reconveyance of the property within a year by payment to her of the amount of her investment in the property and expenses incurred in operating the ranches. On September 12, 1947, the jury rendered a verdict in the case determining $90,000 to be an amount sufficient to repay the $229,361.40 which Ann Y. Oliver invested in the assets on January 5, 1944, after taking into account expenses incurred by her in operating the ranches and receipts from sales of assets, including ranch lands. On December 11, 1947, the court entered an order in the proceeding for the execution by Ann Y. Oliver of a deed and bill of sale for the properties within forty days, provided that within thirty days petitioner deposited the sum of $90,000 to the clerk of the court. Leave was granted the defendants to file a motion for new trial and an amended motion for a new trial. In returns for 1941, 1942, 1943 and 1944, petitioner claimed as interest paid to Ann Y. Corzelius the amounts of $2,000, $10,472.50, $8,595.88, and $8,911.26, respectively. *232 All of the amounts claimed in 1941 and 1943 and $8,159.28 of the amount claimed in 1942, were paid in cash. Of the amount of $8,159.28 paid in 1942, $7,972.50 was paid on June 2, and $186.78 on November 23. Of the amount paid in 1943, $8,297.50 was paid on January 12, and $298.38 on June 21. The amount claimed in 1944 was accrued on the books of petitioner and was cancelled in the transaction entered into on January 5, 1944. The respondent allowed as deductions, in determining the deficiencies for 1941 and 1943, the interest claimed in 1941 and 1942. In her return for 1941, Ann Y. Corzelius reported $6,126.80 of community income from interest without disclosing the origin of the income. Opinion Petitioner alleged that respondent erred in not allowing as a deduction in 1942, a net loss of $65,310.03 sustained in 1944, for which year he claimed a deduction in the amount of $61,879.11 for a loss sustained in the sale of his ranch property on January 5, 1944, and interest in the amount of $8,911.26 paid to his former wife. On brief, he includes the amounts as deductions in computing a net loss in 1944 but does not request any special findings of fact or make any argument on the issues. *233 Issues relating to the deductibility in 1941, 1942 and 1943 of interest in the amount of $2,000, $10,472.50 and $8,595.88, respectively, reported by petitioner as having been paid to Ann Y. Corzelius, were raised by respondent in amendments to his answer. To be deductible from gross income a loss must be actual and real. Gregory v. Helvering, 293 U.S. 465; Burnet v. Huff, 288 U.S. 156. The statute requires that losses be sustained in a closed transaction. United States v. S. S. White Dental Mfg. Co., 274 U.S. 398. The petitioner here relies upon a sale as the event giving rise to a deductible loss. In Commissioner v. Union Pacific R. Co., 86 Fed. (2d) 637, the court said: "A closed transaction for tax purposes results from a contract of sale which is absolute and unconditional on the part of the seller to deliver to the buyer a deed upon payment of the consideration and by which the purchaser secures immediate possession and exercises all the rights of ownership." In Sidney M. Shoenberg, 30 B.T.A. 659; aff'd, 77 Fed. (2d) 446, we said: A sale must rest on a genuine intention to dispose of property without reservation or evasion of mind. What is in the minds of the parties is not *234 to be determined solely by self-serving declarations or testimony of the party interested. It is pertinent to consider all the acts of the parties, the several steps employed, and all other related facts and inferences. Here there was a conveyance and transfer of the ranches and personal property thereon by petitioner to his former wife. However, passage of title is only one element to be considered in determining the real character of a transaction. United States v. Utah-Idaho Sugar Co., 96 Fed. (2d) 756. To have a sale, title must, of course, pass eventually. Charles J. Derbes, 24 B.T.A. 276; aff'd, 69 Fed. (2d) 788. The instruments of transfer executed on January 5, 1944, disclose that with the exception of cash in the amount of $15,000, the property was transferred for cancellation of the indebtedness of petitioner to his former wife, subject to a contract of purchase of lands from the State of Colorado. The petition filed by petitioner in the suit instituted in 1946 against his former wife alleged that the $15,000 was advanced to place him in a position to execute the documents, thus indicating that the amount was additional indebtedness rather than consideration paid for property. *235 Aside from the $15,000, there was no recited consideration other than the debts owed by petitioner. Nothing in the evidence establishes bargaining between the parties in connection with the transaction. That petitioner never intended to make a bona fide sale is established by other circumstances. He alleged in the petition instituting suit against his former wife that the transfers were made to comply with her desire for better security for the indebtedness of petitioner to her, and that he had an understanding with her for reconveyance of the property upon payment within a year of her investments in the ranches and expenses incurred by her in operating the ranches. The existence of such an understanding is shown by the letter written on January 5, 1944, the date of the alleged sale, by Ann Y. Corzelius to Mrs. Hugo A. Auler. Another condition of the transaction gave petitioner an option to buy the property in the event the holder of title decided to sell all or part of it. Thus it is apparent from all of the circumstances that neither the alleged seller nor buyer of the property intended the transaction of January 5, 1944, as an unconditional sale. The reservations made by the parties *236 at the time prevented the transaction from having the actualities necessary for the recognition of loss for income tax deduction purposes. Accordingly, on this issue we hold for respondent. On brief respondent relies upon lack of proof by the petitioners to sustain his allegations of error in allowing the interest deductions in 1941, 1942 and 1943 and lack of payment as to the year 1944. The issue relating to the first three years was raised by the respondent in amendments to his answer, and, as to it, he had the burden of proof. Petitioners were husband and wife throughout the year 1941 and filed returns on the community property basis. As a result, each claimed as a deduction one-half of the interest in the amount of $2,000 paid by petitioner, and petitioner included in his return a like proportion of the interest income reported by his then wife. No proof was made that interest in the amount of $6,126.80 reported as received by the wife did not include the $2,000 received from petitioner. If so, and respondent makes no contention that it was not, the deduction was offset by gross income. Under the circumstances, we hold for petitioners to the extent that the issue relates to the *237 year 1941. The facts relating to the years 1942 and 1943 require a like holding for petitioner. The indebtedness, except $9,000 due on the note executed on June 1, 1943, was incurred during the marital status. It was continued by the separation agreement executed on June 1, 1942, as a liability of petitioner, and on December 26, 1942, a further agreement was entered into in open court that any income earned by the indebtedness prior to or after June 1, 1942, would be the separate property of the wife. The separation agreement, as supplemented, was approved by the court in its decree, entered December 26, 1942, awarding the wife an absolute divorce. All of the interest paid in 1942 was paid after the execution of the separation agreement. There is nothing in the record to suggest that the indebtedness or the interest thereon was alimony. The divorce dissolved the community status that existed prior thereto and separate individual returns were required by debtor and creditor for 1942 and 1943. We find nothing in the facts to withhold from petitioner the benefit of the statute authorizing deductions for interest paid on indebtedness. Of the amount of $10,472.50 claimed as a deduction *238 in 1942, the evidence establishes cash payment in the amount of $8,159.22. As to the remainder of $2,313.22, we know only that it was claimed by petitioner as interest paid within the year. Nothing in the record justifies a finding to the contrary. We sustain the petitioner as to the entire $10,472.50. Petitioner kept his books of account and filed his returns on the cash basis. The interest, $8,911.26, claimed as a deduction in 1944, instead of being paid, was accrued on the books and included as indebtedness of petitioner to his former wife in the alleged sale on January 5, 1944. We have declined to recognize the transfer on January 5, 1944, as a bona fide sale for tax purposes, and, accordingly, the interest was not paid by property other than cash. The interest not having been paid in 1944, petitioner is not entitled to the deduction. Sales of Stock of Pantex Oil Corporation Liquidating Dividend Pantex Oil Corporation Findings of Fact The International Petroleum Corporation, hereinafter referred to as "International," was organized in August 1934 with a capital stock consisting of 200 shares, which was issued as follows: Stockholder
Shares
Petitioner
48
F. M. Corzelius
48
George K. Taggart
48
H. A. Holt
30
J. Earle Brown
20
R. L. Shaw
6
*239 The cost to petitioner of the stock issued to him was $2,400. R. L. Shaw had been associated with petitioner and George K. Taggart since 1926. He was an employee of International during its corporate existence and thereafter until December 1939 was office manager and accountant for the Amtex Petroleum Corporation, hereinafter referred to as "Amtex," and the Pantex Oil Corporation, hereinafter referred to as "Pantex," successors to International. J. Earle Brown was an employee and H. A. Holt was an officer of International. International owned 87.5 per centum of the original stock of the Centennial Oil Company, organized October 10, 1934, Trinity State Oil Company, organized about August 15, 1934, and Trinity State Pipe Line Corporation, organized in or prior to January 1935, until about January 20, 1935, when it acquired the remaining shares, held by Rice M. Tilley. The stocks International owned in domestic corporations were carried on its books in the amount of $12,000. Petitioner, F. M. Corzelius, and George K. Taggart each owned one-third of the stock of the Production Purchasing Co. On January 31, 1937, International charged the account of F. M. Corzelius with $66,267.17, consisting *240 of the following accounts: Notes receivable
$ 7,887.55
Accounts receivable
2,218.88
Accounts receivable (officers
and employees)
56,160,74 [1]
On April 15, 1937, International charged the notes payable account of F. M. Corzelius and credited "Donated Surplus" with $277,312.42, with the explanation that the amount was an advance to the corporation. Under the same date, other entries were made as follows: Investment in affiliated companies
Trinity State Oil Co.
$1,000
Trinity State Pipe Line Co.
125
Centennial Oil Co.
125
$1,250
Donated by F. M. Corzelius
Donated Surplus
$1,250.00
Common capital stock in treasury
$6,638.10
Donated by stockholders
Donated Surplus
$6,638.10 On April 15, 1937, the stock of International was held as follows: F. M. Corzelius
48 Shares
Petitioners
6.2822 Shares
George K. Taggart
6.2822 Shares
Harper A. Holt
3.5758 Shares
J. Earle Brown
2.3822 Shares
R. L. Shaw
.7153 Shares
Treasury stock
132.7623 Shares
Amtex *241 was organized on March 13, 1937, under the laws of Nevada. On about April 15, 1937, all of the assets of International Centennial Oil Co. and Trinity State Oil Co., subject to their liabilities, were transferred to Amtex for all of its stock, consisting of 750,000 shares, which was issued pro rata to stockholders of International. The transferor corporations were then dissolved. The officers and directors of Amtex from the time of its incorporation and thereafter through October 23, 1937, were: F. M. Corzelius
Director and president
Harper A. Holt
Director and vice-president
J. Earle Brown
Director and vice-president
Petitioner
Vice-president
George K. Taggart
Secretary-treaurer
The original stock of Amtex was re-issued September 28, 1937, by the issuance of certificates, as follows: Certificates
Stockholder
for Shares
Total
F. M. Corzelius
450 and
4,904.13
5,354.13
Petitioner
450 and
250.74
700.74
George K. Taggart
450 and
250.74
700.74
Harper A. Holt
281.25 and
117.62
398.87
J. Earle Brown
187.5 and
78.23
265.73
R. L. Shaw
56.25 and
23.54
79.79
Totals
1,875
5,625
7,500 Prior thereto the stockholders held the same proportionate share of the stock. Pantex was organized on October 13, 1937, under the laws of Delaware with *242 a capital stock consisting of 200 shares of common stock, par value $50 each. Petitioner, F. M. Corzelius, and George K. Taggart each subscribed for, and was issued, 24 per centum, 48 shares, of the stock; H. A. Holt, 15 per centum, 30 shares; J. Earle Brown, 10 per centum, 20 shares; and R. L. Shaw, 3 per centum, 6 shares. The cost of the stock was charged to the stockholders. On October 21, 1937, the directors of Amtex adopted a resolution, which was approved by the stockholders the same day, for a partial liquidation of Amtex in accordance with a plan set forth in the resolution. On October 22, 1937, the stockholders of Amtex entered into an agreement with Pantex, by the terms of which F. M. Corzelius agreed to sell to Pantex notes and accounts receivable in the amount of $67,517.17, [1] and petitioner and George K. Taggart agreed to sell demand notes executed by Amtex on the same date in the amounts of $46,058.53 and $200,852.33, respectively, a total of $314,428.03, for class A notes of Pantex, due January 15, 1938, with interest at the rate of 6 per centum per annum, for like principal amounts. Each of the stockholders agreed to sell to Pantex the following shares of stock of Amtex *243 for cash and notes as follows: Notes
Stockholder
Shares
Price
Cash
Class A
Class B
F. M. Corzelius
4,904.13
$380,467.57
$1,000
$298,261.57
$81,206.00
Petitioner
250.74
104,155.15
1,000
21,949.15
81,206.00
George K. Taggart
250.74
104,155.15
1,000
21,949.15
81,206.00
H. A. Holt
117.62
51,378.75
1,575
49,803.75
J. E. Brown
78.23
34,252.50
1,075
33,177.50
R. L. Shaw
23.54
10,275.75
375
9,900.75
Total
5,625.00
$684,684.87
$6,025 [1]
$342,159.87
$336,500.00
The shares transferred constituted 75 per centum of the 7,500 shares of outstanding stock of Amtex. Each individual received a series of eight notes payable monthly commencing April 15, 1938. The principal and interest on the class A notes were payable prior to any payments on the class B notes. The agreement also provided that all of the accounts receivable, notes and stock of Amtex were pledged to secure payment of the notes issued therefor by Pantex. The transaction for Amtex stock was entered on the books of Pantex on October 24, 1937, as a purchase of 75 per centum of the stock of Amtex for $684,684.87 represented by accounts payable, $6,025, and class A and B notes for the remainder. The remainder *244 of the stock of Amtex, and the percentage held of such stock, was as follows: Stockholder
Shares
Per cent
F. M. Corzelius
450
24
Petitioner
450
24
George K. Taggart
450
24
H. A. Holt
281.25
15
J. Earle Brown
187.50
10
R. L. Shaw
56.25
3
Total
1,875
100
On the same day the stockholders of Amtex signed a statement, addressed to Amtex, to the effect that they did not desire to surrender any of their remaining stock, total 1,875 shares, or participate in the partial liquidation and waived their rights with respect thereto in favor of Pantex, the holder of 5,625 shares by purchase from them on that date. On October 23, 1937, Amtex and Pantex executed an agreement in which Amtex transferred to Pantex in exchange for 5,625 shares of stock of Amtex, in partial liquidation proceedings, certain described assets "aggregating an appraised value of $2,441,022.95, charged with liabilities aggregating $1,756,338.03," the net being $684,684.87, the amount paid by Pantex to stockholders of Amtex for 5,625 shares of their stock. The agreement provided that the proceeds of sale and income from the assets should first be applied to payment of the liabilities secured by the assets. The assets and liabilities listed in the agreement *245 for transfer, net amount $684,684.87, were: ASSETS
Cash
$ 53,783.74
Accounts receivable (sales)
54,604.63
U.S. Bonds
9,000.00
Inventories, oil
3,083.25
Producing leases
2,295,000.00
Prepaid charges
25,551.33
$2,441,022.95
LIABILITIES
Notes payable
Banks
$1,464,100.00
Petitioner
$ 45,905.26
George K. Taggart
198,943.71
F. M. Corzelius, Tr.
19,248.07
264,097.04
Accounts payable
27,262.45
Accruals
878.59
$1,756,338.08
Prior to the transfer the depreciated cost bases to Amtex on October 23, 1937, for the producing leases were adjusted upward or downward, as follows, to reflect fair market values as fixed by the officers of Amtex and Pantex for the purpose of making the transfers: Value
Cost to Amtex
as fixed
Cowden-Harper
$ 94,972.47
$ 125,000
T. D. Lewis (Badger)
960,109.35
1,500,000
Chiltipin Creek
279,081.17
450,000
R. S. McConnell
69,820.48
60,000
J. F. Lane
120,117.14
160,000
Total
$1,524,100.61
$2,295,000 Amtex made the following entries in its books on October 23, 1937, to reflect the transaction: Common Stock
$28,125.00
Partial Liquidating Dividend
$ 28,125.00
Contractual Rights
Notes Payable
$1,654,110.86
Accounts Payable
31,732.70
$1,685,843.56
Partial Liquidating Dividend
$1,685,843.56
Partial Liquidating Dividend
$1,633,496.28
Marketable Securities
$ 9,000.00
Crude Oil Inventory
8,277.75
Cowden-Harper
52,366.85
T. D. Lewis
1,000,735.32
Chiltipin Creek
292,937.15
J. F. Lane
127,226.81
R. S. McConnell
73,139.73
1,546,405.86
C. C. Harper Def.
44,925.78
McIlroy Oil Payment
38.00
Prepaid charges
24,848.89
Partial Liq. Dividend
$ 33,401.79
Pantex
Balance due in settlement
$ 33,401.79
Pantex *246 entered the assets and liabilities in its books by the following entry: Amtex
$ 33,401.79
Securities
9,000.00
Crude Oil Inventories
8,277.75
Cowden Harper
$ 125,000
T. D. Lewis
1,500,000
Chiltipin Creek
450,000
J. F. Lane
160,000
R. S. McConnell
60,000
2,295,000.00
Prepaid charges
24,848.89
Notes Payable
$1,654,110.86 [1]
Accounts Payable
31,732.70
Amtex stock
684,684.87
The T. D. Lewis lease was sold on November 3, 1937, for $1,394,135.65. The McConnell lease was sold on December 2, 1937, for $49,800.11. In its return for the fiscal year ended February 28, 1938, Pantex reported losses on the sales of the Lewis and McConnell leases based upon costs of $1,509,654.86 and $59,967.20, respectively, including "fair market value" of the assets when received on October 24, 1937, in partial liquidation of Amtex, a taxable distribution. On May 31, 1941, as of October 23, 1937, the cost basis to Pantex of the Cowden-Harper, Chiltipin Creek, and J. F. Lane leases were revised to $75,187.25, $375,000 *247 and $100,000, respectively, to reflect fair market values agreed upon in conferences with officials of the Treasury Department respecting tax liabilities of Amtex and Pantex, and their stockholders. The transfers were recorded in the books of Amtex as property distributed as of October 1, 1937, in exchange for 5,625 shares of stock held by Pantex in partial liquidation of Amtex. On October 22, 1937, the stockholders of Amtex and Pantex executed an instrument transferring to William S. Hall, Trustee, all of their stock of the corporations and class B notes issued by Pantex. The purpose of the transfers by F. M. Corzelius, petitioner, and George K. Taggart was to guarantee payment of the class A notes issued to them by Pantex the same day in the total amount of $656,677.04. The purpose of the transfers made by each of the other stockholders was to secure payment by said individuals of the following amounts owed by them and deficiencies in payment on the class A notes: Due majority
stockholders
Receivables
on Interna-
due
tional stock
Stockholders
Pantex[1] *248 subscriptions
Harper A. Holt
$42,322.54
$1,500
J. Earle Brown
7,212.22
1,000
R. L. Shaw
5,721.37
300
After the surrender of the 5,625 shares of stock of Amtex by Pantex in the partial liquidation proceedings, each stockholder had the same interest in each corporation. On October 26, 1937, Pantex executed an instrument transferring to William S. Hall, an employee of Amtex and Pantex, in trust, the notes and accounts receivable in the amount of $67,517.17 and notes payable in the amounts of $46,058.53 and $200,852.33 which had been sold to it by F. M. Corzelius, petitioner, and George K. Taggart, respectively, on October 22, 1937, and all of the assets transferred to it on October 23, 1937, appraised value $2,441,022.95, subject to charges against the assets for liabilities in the amount of $1,756,338.08, for the purpose of securing the payment of the class A and class B notes issued to its stockholders. The officers of Pantex on October 23, 1937, were: F. M. Corzelius
President
Petitioner
Vice-president
Harper A. Holt
Vice-president
J. Earle Brown
Vice-president
George K. Taggart
Secretary-treasurer
On November 1, 1937, J. Earle Brown sold to petitioner, F. M. Corzelius, and George K. Taggart his 20 shares of stock of *249 Pantex, 187.5 shares of stock of Amtex, and two class B notes of Pantex, each of the principal amount of $6,482.64, for $1,000, $3,750 and $8,500, respectively. The consideration, $13,250, was paid by Amtex and was charged in equal amounts to petitioner, F. M. Corzelius, and George K. Taggart. As part of the same transaction, the buyers guaranteed payment of four class B notes the seller held of Pantex in the aggregate amount of $12,000. The notes for $12,000 were purchased by Amtex on February 24, 1938, and one-half, or $6,000, was charged to petitioner and the remainder to George K. Taggart. The remaining class B notes held by the seller, amount $8,212.22, were in the possession of William S. Hall, Trustee, as a pledge to secure payment by him of his indebtedness of $7,212.22 to Pantex and $1,000 to the buyers for stock of International. On November 3, 1937, Harper A. Holt sold to petitioner, F. M. Corzelius and George K. Taggart, one-third to each, his 30 shares of stock of Pantex, 281.25 shares of stock of Amtex and a class B note, face amount $5,981.21, for $1,500, $2,518.79 and $5,981.21, respectively. The total consideration of $10,000 was paid by Amtex and charged in equal *250 amounts to petitioner, F. M. Corzelius and George K. Taggart. The remaining class B notes of Pantex in favor of the seller, amount $43,822.54, were in the possession of William S. Hall, Trustee, to secure payment of his indebtedness of $42,322.54 to Pantex and $1,500 to the buyers for stock in International. On May 30, 1941, Pantex charged to surplus as uncollectible receivables due from J. Earle Brown and Harper A. Holt in the amounts of $7,137.22 and $42,247.54, respectively, the amounts being part of the receivables, totalling $67,517.17, with minor adjustments, for which Pantex issued its class A notes to F. M. Corzelius on October 22, 1937. After the stock transactions with Brown and Holt, petitioner, his brother, and George K. Taggart each held 32 1/3 per centum of the stock of Amtex and Pantex and R. L. Shaw held the remaining interests. On December 30, 1937, Pantex made the following payments on its class A notes: F. M. Corzelius
Note No. 1
$67,517.17
Petitioner
Note No. 2
46,058.53
Petitioner
Note No. 13
6,166.00
Petitioner
Note No. 15
3,669.95
George K. Taggart
Note No. 3
46,852.33
George K. Taggart
Note No. 14
6,166.00
On December 31, 1937, Amtex credited its contractual rights account with *251 the following amounts for payments made by Pantex on its class A notes and liabilities transferred to it on October 23, 1937: Class A note held by petitioner
$ 46,058.53
Payment on class A note held by
George K. Taggart
46,852.33
Production Purchasing Co.
26,834.63
First National Bank & Trust Co.
700,000.00
Republic National Bank
380,700.00 On January 1, 1938, F. M. Corzelius entered into a contract with petitioner and George K. Taggart for the sale of his stock of Amtex and Pantex, class A and B notes of Pantex, and his undivided one-third interest in the class B notes issued to J. Earle Brown and Harper A. Holt. The agreement contains a statement that the parties had equal interests in International and to enable it and its successors to reorganize in 1937, the seller had acquired for amounts due him by International a larger proportion of the stock of International than the buyers, and that prior to entering into the agreement, the parties had attempted to reduce his interest in Amtex and Pantex to equal that of each of the buyers. The buyers agreed to cause Pantex to issue to him for application as a credit on a class A note of Pantex in the amount of $98,261.57, an interest in the Chiltipin *252 Creek lease represented by an oil payment in the amount of $65,000, and to convey to the Production Purchasing Company the notes and accounts receivable, amount $67,517.17, acquired from him on October 22, 1937, except the accounts receivable due from Holt, Brown and Shaw, in the aggregate amount of $56,160.74. It then provided that if the transactions resulted in a tax being asserted against the seller greater than was asserted against the buyers because of their participation, each of the buyers would pay one-third of such additional liability, and any costs incurred in contesting the liability. It also provided that: "* * * The price to be paid Seller is intended to be the same amount which he would have received upon his stock in Amtex and Pantex and the Class A and Class B notes of Pantex sold hereunder to Buyers if certain properties belonging to Amtex and Pantex had been sold at the price hereafter stated, and the preliminary steps heretofore provided for had been carried out at the close of business on December 31, 1937, and if those two companies had then immediately and completely liquidated as of January 1, 1938, paying all of their debts to the extent permitted by their *253 resources; it being recognized that all of the debts of both Amtex and Pantex, except the Class A and Class B Notes due by Pantex, should be paid in full before any payments are made upon said Class A or Class B Notes. * * *" The calculation for the price to be paid was to be made by treating the leases owned by Amtex and Pantex as having been sold for $520,000, plus development costs on well No. 3 on the Harper-Cowden lease, and the amount Amtex received from the Shell Petroleum Corporation for the McClintic A and B leases, or, if not so sold, the amount it would have received if a sale had been made; furniture and fixtures to be worth $6,076.50 and other assets at their face value. From the total of such amounts, there was to be deducted all liabilities, except class A and B notes of Pantex, as of the close of 1937, to determine the situation the corporations would be in if the assets had been sold for the amounts specified and all debts, except the class A and B notes, had been paid. The net figure, less the amount of $4,000, was to be the amount payable to the seller by the buyers for the property. The agreement obligated the seller to pay his pro rata share, based on stockholdings, *254 of Federal tax liability of Amtex and Pantex and their subsidiaries, prior to January 1, 1938, and thereafter, computed on a basis less than the costs shown on the books of the corporations, and used as a basis for the sale, with certain limitations. The seller also agreed to resign as an officer and director of Amtex and Pantex. Thereafter the price to be paid was calculated and on February 15, 1938, the parties entered into another agreement for the consummation of the transaction on the basis of the calculations. Leases and other assets were included in the balance sheets of the corporations at values agreed upon by the parties. Leases were included among the assets at a value of $585,000. The class B notes of Pantex were excluded, and the class A notes were included as liabilities of Pantex. Provision was made in the agreement to give the seller his pro rata share of any assets and charge him with any liabilities not disclosed in the balance sheets. All calculations were made as of January 1, 1938. On February 15, 1938, the seller received $120,497.66 from the buyers, computed under their agreements, as follows: "A" notes
$298,261.57
Less oil payment reserve
65,000.00
$233,261.57
Account receivable of seller
10,281.43 [1]
"32 1/3%" net worth ($301,300.33 of Amtex and Pantex)
97,420.44
$340,963.44
Less: 1/3 of Holt and Brown accounts
$ 16,511.59 [2]
1/3 of amount due J. Earle Brown
4,000.00 [3]
1/3 of bills since Jan. 1
2,038.23
22,549.82
Value of stock, notes and receivables
$318,413.62
Withdrawals in 1938
$196,753.99
Furniture and Fixtures
1,161.97
197,915.96 [4]
Amount due
$120,497.66
*255 Amtex issued a check in favor of F. M. Corzelius for $120,497.66 for the property and charged the amount thereof to petitioner and George K. Taggart, one-half to each. On February 15, 1938, Amtex re-issued the certificates F. M. Corzelius had held for 606.25 shares of stock in favor of petitioner and George K. Taggart, one-half to each, and Pantex re-issued the 64.66 shares of stock he held, one-half to each buyer. On February 28, 1938, Pantex credited the class A notes outstanding in the name of F. M. Corzelius with $65,000, and charged his account with $233,261.57, the latter amount being the amount of class A notes sold to petitioner and George K. Taggart. At the same time it credited the class A note account of petitioner and George K. Taggart each with $117,580.65, the aggregate *256 of $235,161.30 being the sum of the net amount of class A notes sold, plus interest on $33,261.57 from January 1, 1938, to February 15, 1938. The books of Pantex disclose that petitioner held $282,529.80 of its class A notes on May 31, 1938, as follows: Date
Amount
Oct. 22, 1937
$ 21,949.15
Oct. 22, 1937
100,000.00 [1]
Dec. 15, 1937
$146,669.95
Payment
3,669.95
143,000.00 [2]
Feb. 15, 1938
17,850.65 [1]
Total
$282,529.80
On May 31, 1938, Amtex was indebted to Pantex in the amount of $202,087.59. At the same time petitioner and George K. Taggart owed Amtex $203,657.06 and $188,107.49, respectively. The liability of petitioner and George K. Taggart to Amtex was reduced to $98,611.93 and $91,065.03, respectively, by payments to Pantex for Amtex in the amounts of $105,045.13 and $97,042.46. The payments to Pantex were made by credits on class A notes, plus interest thereon. Petitioner's credit on principal was $96,575.83 and interest $8,469.30. After applying such credits, petitioner and George K. Taggart held class A notes of Pantex in the face amounts of $185,953.97 and $356,013.99, respectively, for which, on June 1, 1938, *257 Pantex issued interest-bearing renewal notes as follows: Petitioner
George K. Taggart
$ 21,949.15 [1]
$ 21,949.15 [1]
98,611.93 [2]
91,065.03
65,392.89 [3]
242,999.81
Total $185,953.97
$356,013.99
The notes for $98,611.93 and $91,065.03 were then delivered to Amtex as security for the payment by the payees of notes for like amounts which they had given to Amtex for their debts to it for like amounts. On February 14, 1939, as of the close of the month, the last day of its fiscal year, Amtex made the following entry in its books: Donated surplus, 75% of
balance
$188,296.83
Partial liq. dividend, 75%
of deficit in earned sur-
plus Feb. 28, 1938
10,735.65
Partial liq. dividend, to
close account
111,964.25
Earned surplus
$ 10,735.65
Reserve for evaluation
300,261.08
To reflect the appreciation and
depreciation or reduction in
value of property of Amtex
Petroleum Corporation at the
date of retirement of 3/4ths of
the capital stock and the distri-
bution of 3/4ths of such net ap-
preciation in partial liquidation.
*258 In his return for 1937, petitioner reported on the installment basis capital gain of $100,910.90 from the sale of 250.74 shares of stock of Amtex on October 23, 1937, based upon a consideration of $104,155.15 consisting of $1,000 cash, class A notes aggregating $21,949.15 and class B notes aggregating $81,206, and a cost of $3,244.25, or $12.9387 a share. He reported a total cost of $9,066.66 for the 700.74 shares of stock he held before the transfer, consisting of $2,400 for 48 shares of stock of International, and $6,666.66 for 333 1/3 shares of stock of the Trinity State Oil Co., 41 2/3 shares of stock of the Centennial Oil Co., and 41 2//3 shares of stock of the Trinity State Pipe Line Corporation, which last three blocks of stock were reported as having been donated to International on January 20, 1937. The returns filed by petitioner for the years 1938 to 1944, inclusive, disclose no income for additional taxable gain realized from the sale. Petitioner also reported a sale to Pantex on October 22, 1937, at cost of notes of Amtex in the amount of $46,058.53. On December 27, 1938, petitioner sold 150 shares out of the 303.125 shares of stock of Amtex which he had acquired from *259 F. M. Corzelius on February 15, 1938, 16 shares of stock of Pantex, and $27,068.67 (one-third of $81,206 issued to F. M. Corzelius October 22, 1937) class B notes of Pantex, all of which he acquired from F. M. Corzelius on February 15, 1938, to George K. Taggart, George K. Taggart, Jr., C. R. Taggart, and William S. Hall. On the same day stock of Amtex and Pantex was re-issued as follows to reflect the sale: Stockholder
Amtex
Pantex
George K. Taggart
37.5 shares
6 shares
George K. Taggart,
Jr.
28.125 shares
1 share
C. R. Taggart
28.125 shares
3 shares
W. S. Hall
56.25 shares
6 shares
Petitioner
153.125 shares
16.33 shares
In his return for 1938, petitioner reported the sale on December 27, 1938, for a total consideration of $20,000, as follows: Sales price
Cost
150 shares stock of Amtex
$16,937.98
17,544.73
16 shares stock of Pantex
16.00
.50
Class B notes of Pantex
3,046.02
1,071.89
On August 8, 1939, R. L. Shaw sold his stock of Amtex, 56.25 shares, to Amtex and six shares of stock of Pantex to Pantex for $4,914.29 and $100, respectively. Liabilities of the seller to the buyers, and $300 due petitioner, his brother and George K. Taggart for stock in International, were released in connection with the sales. At *260 the same time he sold his class B notes of Pantex, face amount $9,900.75, to petitioner, and other stockholders, for $100, and released Amtex and Pantex of all claims against them for a payment of $2,000 by each. The $100 was paid by Pantex and charged to the buyers. Pantex entered the stock on its books as treasury stock. On March 31, 1941, the stockholders of Amtex and Pantex, their holdings in each corporation being in the same proportions, adopted a plan of reorganization, effective April 1, 1941. At that time the same individuals were officers of each corporation. The plan provided for (1) the collection to the extent feasible before the transaction was consummated of all receivables; (2) the issuance pro rata by Pantex to stockholders of Amtex of the six shares of stock Pantex held in its treasury, such stock upon receipt to be delivered to Amtex for all of its assets, subject to its liabilities; and (3) the surrender of all of the stock of Amtex to that corporation for cancellation, upon receipt of which Amtex would surrender its charter. Thereafter the plan was carried out as of April 1, 1941, and as a result petitioner and the other stockholders surrendered their stock in *261 Amtex for cancellation in complete liquidation of Amtex and, with the exception of Amtex, received treasury stock of Pantex as follows, which increased their holdings of stock of Pantex to the amount shown: Shares
Stockholder
Amtex
Pantex
Petitioner
759.375
2.51
83.51
George K. Taggart
946.875
1.56
104.12
Estate of Maud G.
Taggart
1.56 [1]
George K. Taggart, Jr.
28.125
.09
3.09
C. R. Taggart
28.125
.09
3.09
William S. Hall
56.25
.19
6.19
Total
1818.75 [2]
6
200
Pantex credited its earned surplus account with the amount of $267,388.42 for assets received from Amtex in the liquidation proceedings, with the explanation that the property was received in a reorganization. The liquidation of Amtex was not reported by petitioners in their returns for 1941. On March 31, 1941, the books of Pantex disclosed that it had outstanding, in the name of petitioner, class A notes of the face amount of $83,854.64. On about March 31, 1941, the Contractual Rights account set up by Amtex October 22, 1937, for secondary liability on liabilities assumed by Pantex was closed by a charge of $19,234.04 to George *262 K. Taggart. The class A notes in the amounts of $98,611.93 and $91,065.03 which petitioner and George K. Taggart delivered to Amtex on June 1, 1938, as security for the payment of their notes for like amounts, were assigned to Amtex on March 31, 1941, in payment of the notes of the individuals. The class A notes were then transferred to Pantex in the reorganization. The notes were entered in the books of Pantex as property received from Amtex in the reorganization. The notes were eliminated from the books in adjustments made on a consolidated trial balance and thereafter did not appear as a liability on the books of Pantex. The assignment by petitioner to Amtex of his note for $98,611.93 was not reported in the return filed by petitioner for 1941. On June 16, 1941, stock of Pantex was surrendered and re-issued, and other stock held by the individuals was, as follows: Shares
Surren-
Other
Stockholder
dered
Re-issued
Stock
Petitioner
81
67.49
2.51
George K. Taggart
101
32.38
1.56
C. R. Taggart
3
13.91
.09
George K. Taggart, Jr.
3
13.91
.09
William S. Hall
6
15.81
.19
Maud G. Taggart, estate
50.50
1.56
194
194
6 The transaction, in which petitioner surrendered 13.51 shares in excess of the shares re-issued to him, was *263 not reported in the return filed by petitioner for 1941. On June 16, 1941, the class B notes issued by Pantex on October 22, 1937, in the aggregate amount of $336,500 were carried in the books of Pantex in the names of the original payees. On that date Pantex issued 6 per cent demand notes for the class B notes, as follows: George K. Taggart
$ 10,116.10
George K. Taggart
46,987.95
Maud G. Taggart estate
40,603.00
Maud G. Taggart estate
46,987.95
Petitioner
58,475.43
Petitioner
59,299.57
George K. Taggart, Jr.
23,555.00
C. R. Taggart
23,555.00
William S. Hall
26,920.00
Total
$336,500.00
Maud G. Taggart, the wife of George K. Taggart, died on June 24, 1939. In the estate tax return filed for her estate by George K. Taggart as executor, no value was placed on the decedent's community one-half interest in class B notes of Pantex in the amount of "$94,688.31." The books of petitioner were opened on December 31, 1938, by Ted Ferguson, now deceased, from working sheets prepared by him. The stock petitioner held in Amtex was entered in the books and thereafter adjusted as follows: Acquired
Shares
Cost
Original issue
450
$ 5,822.40
Nov. 1, 1937
62.5
1,250.00
Nov. 3, 1937
93.75
939.60
1938
153.125 [1] *264 $17,910.25
Reduced 1939
118.46
17,791.79
Nov. 1937 in-
creased Feb.
26, 1941
481.59
Total
759.375
$26,285.38
Petitioner's books showed the following amounts as costs of stock of Pantex: Acquired
Shares
Cost
October 13, 1937
48
$ 2,400.00
November 1, 1937
6.67 [1]
333.33
November 3, 1937
10 [2]
500.00
February 15, 1938
16.33 [3]
.50
November 3, 1937 additional
cost
349.65
November 1, 1937 additional
cost
131.84
Total
81
$ 3,715.32
April 1, 1941 Transfer Am-
tex costs
26,285.38
April 1, 1941 Transfer Am-
tex costs
86.87
Total
83.51
$30,087.57
Sale June 16, 1941
13.51
13.51
Total
70
$30,074.06 On December 31, 1941, when the book cost for Pantex stock was shown as $30,074.16, the account was "closed to set up corrected value." The new entries made were: Acquired
Shares
Amount
Mar. 31, 1941, Cert. 25
2.51
$27,753.04
June 16, 1941, Cert. 33
64.67 [1]
3,370.74
Feb. 15, 1938, Cert. 34
2.82 [2] *265 2.82
Total
70
$31,126.60
A journal entry was made for the difference of $1,052.54 between the accounts with the explanation "To accord basic cost of Pantex Oil Corporation stock for details in work paper file." Other entries were made in the account for sales as follows: Sale Dec. 31, 1941
2.51 shares
$27,753.04
Sale Dec. 31, 1942
16.8725 shares
879.43
Sale Jan. 15, 1943
50.6175 shares
2,494.13
Total
70 shares
$31,126.60
On December 31, 1941, petitioner sold 2.51 shares of stock of Pantex to William S. Hall for $1.00. There were no "strings attached" to the sale or any "side agreements" entered into between the parties respecting the transaction. Petitioner did not know whether the stock had a fair market value at that time. He made the sale to place himself in a position to claim a loss deduction in his return. On September 8, 1945, the purchaser sold the stock for $293.67. In his return for 1941 petitioner claimed a long-term loss of $27,752.04 on the sale to William S. Hall, based upon a cost basis of $27,753.04. In his determination of the deficiencies against petitioners for 1941, the respondent disallowed the loss as a deduction upon the ground that the cost basis had not been substantiated *266 and that the sale was not made at arm's length at fair market value. During the fiscal year ended February 28, 1942, Pantex adjusted its basis in the Cowden-Harper, Chiltipin Creek, and J. F. Lane leases to agree with a revenue agent's report. On December 28, 1942, Pantex distributed ratably to its stockholders, subject to the trust agreement executed on October 22, 1937, an oil payment in the face amount of $125,000 in liquidation and retirement of 25 per centum or 50 shares of its capital stock. On December 31, 1942, petitioner surrendered 16.8725 shares of stock in the partial liquidation, which left him owning 50.6175 shares of the corporation's stock. The stockholdings of petitioner and other stockholders of Pantex after the partial liquidation were as follows: Stockholder
Shares
Petitioner
50.6175
George K. Taggart
25.455
Maud G. Taggart estate
39.045
George K. Taggart, Jr.
10.5
C. R. Taggart
10.5
William S. Hall
13.8825 [1]
Total
150
In his return for 1942 petitioner reported long-term gain in the amount of $33,433.51 from the dividend, computed as follows: Gross sales price
$42,187.50
Received in 1942
34,312.94
Cost
879.43
Gain
$33,433.51
During *267 the fiscal year of Pantex ended February 28, 1943, the Cowden-Harper lease was adjusted again by a charge of $44,925.78 to surplus so that the account for the lease would agree with a revenue agent's report. Petitioner and George K. Taggart at all times held notes of Pantex in excess of their indebtedness to the corporation. On January 15, 1943, petitioner sold his 50.6175 shares of stock of Pantex, the class A notes he held of Pantex, being in the amount of $21,949.15 and $49,743.37 (balance on note received June 1, 1938, for $65,392.89), and renewal notes received on June 16, 1941, in the amount of $58,475.43 and $59,299.57 for class B notes, to George K. Taggart, George K. Taggart, Jr., and C. R. Taggart. In his return for 1943 he reported long-term gain in the amount of $12,284.20 from the sale, based upon a selling price of $100,385.93 and cost of $88,101.73. From October 22, 1937, until September 1940 when it sold its Trinity River lease, Amtex operated two oil-producing leases. Thereafter during its existence it operated the remaining lease. During all of such period, Amtex charged from about 75 to 80 per centum of its overhead expenses to Pantex. The percentage each year was *268 computed on the basis of oil production. The balence sheets included by Pantex in its returns for the fiscal years ended in the years 1938 to 1942, inclusive, disclose a deficit surplus of $108,288.73, $207,155.36, $228,535.09, $223,600.67 and $206,945.85, respectively, and paid-in surplus of $62,765.59 in the last year. The balance sheet of Amtex in its final return for the month of March 1941 discloses a deficit of $37,233.37 and paid-in surplus of $62,765.59. Opinion Several issues are involved under the facts just found. The petitioners are claiming a deduction in the amount of $25,572.04 as a long-term capital loss sustained in 1941 in the sale of 2.51 shares of stock of Pantex on December 31, 1941, for $1.00. Petitioner C. F. Corzelius claims deductions in 1941 and 1942 of not less than $34,956.88 for an operating loss in 1943. He asks that we recognize, in computing such operating loss, capital gain in the amount of $12,284.20 realized from the sale of stock and notes of Pantex on January 15, 1943. By an amendment to his answer in Docket No. 12214 respondent alleged that petitioner had no cost basis to recover in reporting gain from the liquidating dividend received from Pantex *269 in 1942 and the sale of Pantex stock and notes in 1943, having recovered his cost in prior years, and, as a result, all of the amounts received constitutes long-term gain. The parties are in agreement on the amount received by petitioners in each of the three transactions involved herein. They differ on the cost of the stock, and decisions thereon will resolve the questions before us. Respondent concedes that the transaction of April 15, 1937, involving International and Amtex, was a non-taxable reorganization. Petitioners make no contrary contention. The petitioner paid $2,400 for his stock in International and such amount became his basis for the 700.74 shares, consisting of two certificates, one for 450 shares and one for 250.74 shares, of re-issued stock he held in Amtex on September 28, 1937. From this point, the parties take opposite views. From December 27, 1938, until the liquidation of Amtex on March 31, 1941, petitioner held 759.375 shares of stock of Amtex acquired as follows: Sept. 28, 1937
700.74 [1] *270 Transfer to Pantex Oct. 22,
1937
250.74
450
J. Earle Brown 11-1-37
62.5
Harper A. Holt 11-3-37
93.75
F. M. Corzelius 2-15-38
303.125
909.375
Sold 12-27-38 out of shares acquired
2-15-38
150
759.375
The 759.375 shares were surrendered March 31, 1941, for 2.51 shares of treasury stock of Pantex in complete liquidation of Amtex. The shares of stock so received were sold on December 31, 1941, to William S. Hall for $1.00. The cost to petitioners of such stock is the first question. Petitioners contend that they correctly computed loss on the sale on the basis of cost of $25,573.44 and on brief rely on categorical testimony of William S. Hall that such amount was the cost of the stock. They also contend that the liquidation of Amtex on March 31, 1941, was a non-taxable reorganization and, as a result, the 2.51 shares of stock of Pantex took the basis of the 759.375 shares of Amtex stock given up in exchange therefor. Petitioners are silent on whether the partial liquidation of Amtex on October 22, 1937, affects the result. Respondent argues that the various transactions between January 31, 1937, and October 22, 1937, were entered into merely for the purpose of avoiding taxes due from the corporations on leaseholds sold in 1937, and did not affect petitioner's cost of $2,400 in Amtex stock, other than to reduce it by $858.75, or to $1,541.25, for the 250.74 shares *271 he transferred to Pantex on October 22, 1937. Respondent asks us to ignore the acquisitions of stock from Brown, Holt, and F. M. Corzelius after October 22, 1937, upon the ground, in general, that they were book transactions, and not to recognize the transaction in October 1937 as a taxable reorganization. In short, respondent argues that petitioner recovered all of his cost prior to December 31, 1941, the date of his sale of 2.51 shares of stock of Pantex for $1.00. Petitioners had the burden of proving their right to the deduction of $25,572.04, one-half by each, claimed in their returns, including the cost basis of the stock. As already indicated, petitioners ask us to follow blindly the unsupported testimony of William S. Hall that the cost was $25,573.04. This we decline to do in the face of evidence to the contrary. The cost claimed by petitioners was taken from petitioner's book records, the entries of which are set forth in our findings. First we know that he had a cost of $2,400 in his original stock of Amtex which cost is reflected in the cost of the 450 shares he held immediately after the October 1937 transaction with Pantex. Such stock was entered in petitioner's books *272 at a cost of $5,822.40 and reflects amounts for costs of stock of the Trinity State Oil Co., Centennial Oil Co., and Trinity State Pipe Line Co., which stock was donated to International in January 1937, according to petitioner's return. There is no proof here of such ownership and donation, and, accordingly, we must decline to allow any amount as cost issuing from that alleged transaction. Next we find entries made for costs of stock acquired from Brown and Holt in November 1937. The transactions with them lacked the substance necessary for recognition for tax purposes. There was no material difference in their status as stockholders, and comment upon the dealings with Brown will be sufficient for present purposes. Brown was a stockholder of record of International and was indebted to the majority stockholders for the subscription price in the amount of $1,000. In January 1937, he owed International $7,212.22 and the liability was charged to F. M. Corzelius on the books of International. Next we find Corzelius selling the debt to Pantex on the October 1937 transaction for class A notes of the buyer and then a pledge by Brown, as part of the series of transactions in that month, of *273 his stock in Amtex and Pantex and class B notes of Pantex to secure the payment of the debts. The procedure taken to eliminate the indebtedness of F. M. Corzelius to International for the amount does not appear in the evidence. Brown received on the October 1937 transactions two class B notes totaling $8,212.22, an amount equivalent to his indebtedness to Pantex and its majority stockholders. Later, Brown's stock in Amtex and Pantex and a portion of his class B notes were sold to the majority stockholders, notwithstanding the pledge thereof. It does not appear that the notes totaling $8,212.22 were ever paid; in fact they were re-issued on June 16, 1941, to others and there is no showing here how they left Brown. One-third of the indebtedness was deducted from the selling price of the stock of Amtex and Pantex and class A and B notes acquired by petitioner and George K. Taggart from F. M. Corzelius on February 15, 1938, which discloses that the buyers had previously assumed equal liability with the seller for payment of the accounts. The indebtedness was charged off by Pantex on May 30, 1941, as uncollectible, notwithstanding the pledge of class B notes to secure it and the liability *274 of petitioner and George K. Taggart. These transactions with minority stockholders disclose complete disregard of agreements. They amounted to nothing more than paper transactions to create facts having signs of reality. Next we find in the account as eventually being reflected in the cost of $27,753.04, a charge of $17,791.79, after adjustment, for 153.125 shares of Amtex stock acquired from F. M. Corzelius on February 15, 1938, that being the number of shares remaining after a sale of 150 shares out of the lot on December 27, 1938. After the transaction was completed, the buyers instructed William S. Hall to compute the cost of the stock and notes. He determined from his own interpretation of the sales agreement that the total cost to each was $154,066.10, a figure more than double the amount actually paid by Amtex for each of the buyers and charged to them on its books. We know that petitioner agreed to pay $60,248.83 for one-half of the assets sold but the agreement of sale contains nothing disclosing the amount to be paid for each of the assets acquired. The class A notes were included in the computation of cost at their face amount. The class A notes were included in the liabilities *275 of Pantex, contrary to the agreement. The class B notes were excluded therefrom, as agreed, and were not listed in the agreement of February 15, 1938, as an asset for which any consideration was to be paid. Had class A notes been excluded the net worth of Pantex would have been increased proportionately and had like treatment been accorded the class B notes, the resulting deficit would have more than offset the alleged net worth of Amtex in the amount of $285,369.97. The 303.125 shares of stock of Amtex acquired by petitioner were shown in the computation at a cost of $35,454.98. The figure was arrived at in this manner. The combined net worth of the two corporations was computed to be $301,300.33, of which the seller's stockholder's interest was 32 1/3 per cent, or $97,420.44. From this figure was deducted $22,549.82 for current bills, and Holt and Brown accounts, leaving $74,870.62 as the "value" of the stock and class B notes sold by F. M. Corzelius. As the net worth of Amtex was, as computed, 94.71 per cent of the total net worth of the two corporations, that percentage of the adjusted net worth, or $70,909.96, was determined to be the cost of the Amtex stock, one-half thereof *276 to each buyer. The remaining cost to each was allocated to the class B notes and Pantex stock, $1 to the latter, on the theory that since the net worth of Pantex was 5.29 per cent of the combined net worth, the class B notes and Pantex stock should bear that proportionate share of the cost. In allocating cost to the class B notes, an amount, $328.70, was included for one-sixth of the notes, amount $49,803.78, issued to Holt in the October 1937 transaction, notwithstanding the fact that Holt, according to the evidence here, still owned $42,322.54 face amount of the notes, the seller having had no greater interest than a one-third of one note, amount $5,987.21, which the three parties purchased from Holt on November 3, 1937. From what has been said it is evident that the allocations of cost were not based upon actual facts. Furthermore, the consideration was paid by Amtex and charged in equal amounts to the buyers. Petitioners point to no evidence that petitioner ever paid the purchase price and we find none among the voluminous and complicated facts involved in the issues. The lack of reality of the dealings with the original minority stockholders is clearer when viewed in the light *277 of the October 1937 transaction. The inference to be drawn from that series of transactions is that petitioner and the other majority stockholders of Amtex desired to create a higher basis for most of its oil-producing leases with tax benefit to themselves and the corporations they controlled. Their plan, in the final analysis, was simple. First, they increased the book value of leases selected for transfer by $748,954.14 and then other assets and liabilities were marked for transfer to Pantex to make net assets of $684,684.87. This amount fixed the price to be paid by Pantex to the stockholders for 75 per centum of their stock of Amtex, payable in notes and $6,025 cash, which amount, however, was credited to accounts of the sellers. Pantex then surrendered the stock so acquired for the net assets, and was in possession of assets with a higher book basis without a payment of anything other than promises to pay or a change of the beneficial interest of stockholders. Some of the assets selected for transfer were not transferred. But that was not regarded as important by the identical officers and stockholders of the corporations. To make the difference agree with the plan to transfer *278 net assets of $684,684.87, Pantex charged Amtex, and the latter credited the former with, $33,401.79. Pantex soon realized in a tax computation some of the benefit the plan obviously was designated to achieve. In reporting for taxation the sale in November 1937 of the T. D. Lewis lease and the McConnell lease in December 1937, gain or loss was computed on the basis of fair market values determined for the purpose of the transfers from Amtex. Furthermore, it is evident that the class B notes were never intended to have real value. First, the assets transferred by Amtex were subject to the liabilities. After eliminating the fictitious value in the producing leases, the net worth was not very much, if anything. Next, the net was placed in trust to secure payment of the notes, A notes, held only by majority stockholders, first. The notes received by the minority stockholders were pledged to secure either alleged debts to Pantex and majority stockholders. On November 1, 1937, within a week after the class A notes were issued, Brown sold part of his holdings for about 65 cents on the dollar. Two days later, Holt received on a like transaction par for one of his notes. In his sale to petitioner *279 and Taggart on February 15, 1938, F. M. Corzelius placed no value on the notes in computing the net worth of Pantex. George K. Taggart placed no value on them as of June 24, 1939. Finally, none was paid by Pantex prior to June 16, 1941, and it does not appear whether any of them were paid after that date. Amtex and Pantex were in the same business. Overhead expenses were paid by Amtex, and Pantex was charged with a portion thereof, computed on the basis of oil produced. Petitioners cite no business purpose for organizing Pantex and we find none. The corporation was created and used in a plan designed to create a false basis for capital assets. Considering all of the facts and the inferences therefrom we conclude that petitioners have not established a right to include as cost of stock of Amtex any amount for the shares acquired from Brown and Holt. Thus, there is no proof of cost other than the original payment of $2,400. Such amount was recovered in sales made prior to 1941. On April 1, 1941, when Amtex was dissolved, the balance of $26,285.38 in petitioner's account as cost of the 759.375 shares of stock of Amtex was transferred to the account he had for cost of stock of Pantex, *280 and $86.67 was entered as the cost of 2.51 shares of stock of Pantex which he had received in connection with the dissolution on that date of Amtex. On June 16, 1941, the amount of $13.51 was deducted as cost of 13.51 shares sold on that date. On December 31, 1941, the date of sale of the 2.51 shares, the Pantex stock account, having a balance of $30,074.06, was closed and a new account opened showing $27,753.04 as the cost of the 2.51 shares and $3,373.56 as the cost of the remaining 67.49 shares then held by petitioner. The manner of arriving at the adjusted cost, an increase of $1,467.66, is not in the evidence. There remains for decision under the issues the question of gain realized by petitioner from the partial liquidation of Pantex in December 1942, in which 16.8725 shares were surrendered by petitioner, and from the sale of all of his remaining stock, 50.6175 shares, and notes of Pantex in January 1943. The shares constitute the remainder of petitioner's original issue of 48 shares and acquisitions from Brown, Holt, and F. M. Corzelius. As already stated, the difference between the parties relates to petitioner's cost basis. According to petitioner's books he had a cost basis *281 of $3,373.56, of which he claimed $879.43 in reporting gain on the partial liquidation and the remainder, $2,494.13, in the 1943 sale. The cost of the 67.49 shares in the original account was $3,701.81, after deducting $13.51 for an alleged sale of 13.51 shares on June 16, 1941. All we know about the June 16, 1941, transaction is that petitioner surrendered 81 shares and was reissued 67.49, a loss of 13.51 shares. The loss came out of the shares he acquired from his brother on February 15, 1938, 16.33 shares of which were entered at a cost of $.50. The reason for the increase in cost of the same stock does not appear. The transaction was not reported in the return petitioner filed for 1941. Adjustments were made in the cost of the other shares when the new account was opened on December 31, 1941, and no satisfactory reason appears in the evidence for such action. The circumstances surrounding the acquisitions from the individuals were the same as those involved in the Amtex stock which we declined to recognize for tax purposes. Accordingly, and for other reasons already stated, we decline to allow any cost to petitioner for such shares. Respondent admits on brief that petitioner had *282 a cost of $2,400 in the original 48 shares. Such amount will be used in computations under Rule 50 as the cost of the portions thereof involved in the partial liquidation and sale. In addition to stock in Pantex, the sale in 1943 involved all of the class A and B notes petitioner held of that corporation, amounts $71,692.52 and $117,775, respectively. Petitioner computed gain on the transaction on a cost basis of $88,101.73. The record is devoid of any evidence as to the manner of arriving at such cost basis. The notes received by petitioner in the October 1937 transaction were treated as having a fair market value equal to their face amount in reporting gain on an installment sale of the stock for the notes and cash. Notwithstanding recoveries subsequently made by petitioner on the notes, as set forth in our findings, the proceeds were not returned as additional gain realized from the sale. Accordingly, petitioner did not become entitled to use such value as a basis in computing gain or loss in a sale in the future. If he had acquired such a stepped-up basis, we, not knowing the amount of notes sold in the taxable year, would not be in a position to make an apportionment. Of the *283 class A notes, one, for $21,949.15, was renewal of the notes issued to petitioner in the October 1937 transaction and the other note was the balance, $49,743.37, due on a note issued June 1, 1938, for $65,392.89 out of notes purchased from F. M. Corzelius on February 15, 1938, one given for assumption of corporate indebtedness on December 15, 1937. The evidence lacks facts to determine what basis, if any, petitioner had on the note for $21,949.15. Neither do the facts disclose the circumstances surrounding the assumption by petitioner on December 15, 1937, of corporate debts from which it might be possible, if shown, to find some basis for the portion of the other note derived from that source. The cost of the purchases made from F. M. Corzelius on February 15, 1938, was paid by Amtex and charged to petitioner but proof of cost, as already shown, is lacking. Under the prevailing circumstances, we are in no position to determine any amount of cost ascribable to that transaction. As late as June 16, 1941, the books of Pantex showed that petitioner still held the class B notes in the amount of $81,206 issued to him in the October 1937 transaction. For such notes, petitioner on June 16, *284 1941, received demand notes of Pantex aggregating $117,775. We know that after the October 1937 transaction petitioner acquired some of the notes outstanding in the names of Brown, Holt, Shaw, and F. M. Corzelius and disposed of some of them on December 27, 1938; otherwise there is no explanation in the record as to manner in which it was determined that petitioner was entitled to receive new notes in the amount issued to him. For reasons already discussed in connection with other questions, we are unable to assign any cost basis to the class B notes. Under all of the evidence, we are unable to find that petitioner is entitled to any basis for the notes sold in 1943. Gain on Sale of Stock Deductions for Interest Findings of Fact During 1939 petitioner acquired the following shares of stock of Minas de Chihuahua, S. A., a foreign corporation, hereinafter referred to as Minas: Date acquired
Shares
Cost
March 23, 1939
100
$ 7,000
March 24, 1939
155 - $ 6,000
April 30, 1939
30,000
36,000
April 5, 1939
15
1,500
June 5, 1939
15
1,500
In his returns for 1939 and 1940, petitioner reported sales of stock of Minas, as follows: 1939
1940
Shares sold
15
4
15
Acquired
3-24-1939
3-24-1939
4-5-1939
Sold
6- 9-1939
2-26-1940
5-1-1940
Sales price
$12,000.00
$5,000.00
$2,421.06
Cost
3,483.90
929.04
1,500.00
Gain
8,516.10
4,070.96
921.06
On *285 December 11, 1941, petitioner made the following journal entry in his books to record the sale of the remaining 251 shares of stock of Minas to Eloy S. Vallina, a banker in Chihuahua, Mexico: Notes payable
$ 25,000
Receivable installment
sales contract
1,475,000
Minas stock
$ 40,087.06
Installment sale, Minas stock
1,459,912.94 The explanation for the entry was as follows: "To record contract of sale and escrow agreement whereby C. F. Corzelius sells to Eloy Vallina 251 shares of the capital stock of Minas de Chihuahua." The contract of sale provided for payments to petitioner based upon the amount of ore removed from a certain mine. The mine ceased operations at a time not disclosed by the record and petitioner does not have the stock. In his returns for 1941, 1942 and 1943 petitioner reported the transaction as an installment sale in which he realized the following long-term gains based upon a sales price of $1,500,000 and total cost of $40,087.06: 1941
1942
1943
Received
$137,700.00
$50,100.00
$28,761.44
Cost applied
3,679.99
1,338.91
768.64
Gain
$134,020.01
$48,761.09
$27,992.80
The property settlement agreement entered into by petitioner and his then wife on June 1, 1942, as amended in open court, provided *286 that the sales contract, and income therefrom, should remain the sole and separate property of petitioner. The agreement was approved by the court in a divorce decree signed on December 26, 1942, and was a final division of community property between the parties and thereafter the income on the property set apart to each constituted the separate estate of such owner. In his determination of the deficiencies for 1941 the respondent made no adjustments in petitioner's computation of gain on the sale of the stock. In 1942 and 1943 he reduced the amount received by $6,755.85 and $2,491.99, respectively, for legal fees and adjusted the ratio of cost to amounts received, resulting in gain of $42,186 in 1942 and $25,567.53 in 1943. From March 17 to June 20, inclusive, in 1941 petitioner borrowed an aggregate of $62,500 from Eloy S. Vallina. The loan was paid in full on December 11, 1941. On June 1, 1942, petitioner borrowed $5,000 from the same source and paid the loan on September 9, 1942. The books of petitioner contain entries for interest paid to Eloy S. Vallina on July 7, 1941, and June 1, 1944, in the amounts of $150 and $6,248.59, respectively. From August 15, 1944, to December 29, *287 1944, petitioner borrowed an aggregate of $34,495 from the same individual. On January 1, 1941, petitioner was indebted to Banco Commercial Mexicano, S. A., in the amount of $7,500. During 1941 he paid interest in the amount of $458.33 on the indebtedness, and on January 9, 1942, made the last payment on principal. On May 4, 1943, and May 24, 1943, he borrowed $5,000 and $55,000, respectively, from the same source at a discount of $50 on the first loan and $3,000 on the second. In 1943 he paid interest thereon in the amount of $300. The loan for $5,000 was paid in full on October 29, 1943. During 1944 he paid interest in the amount of $2,441.33 on the indebtedness, and $25,000 on principal of the loan for $55,000. In returns for 1941, 1943 and 1944 the petitioner claimed as interest paid to Eloy S. Vallina and Banco the following amounts: Villina
Banco
1941
$ 608.33
1943
5,177.34
1944
$4,594.99
3,833.22 In his determination of the deficiencies for 1941 the respondent did not disallow any of the deductions. Opinion As set forth in our findings, respondent in determining the deficiencies treated the transaction entered into December 11, 1941, as a sale of Minas' stock with the ordinary tax *288 consequences. Petitioners alleged in amendments to their petitions filed for 1941 a right to a carry back deduction of not less than $34,958.88, the amount determined by respondent after adjusting the amount of gain from the sale, on account of a net loss in 1943. By amended answers to conform to proof, respondent alleged that the amounts received in 1941, 1942 and 1943, $137,700, $50,100 and $28,761.44, respectively, represent dividends paid by Minas, taxable as ordinary income, and not installment payments on the sale of the stock, as reported by the petitioners. Respondent concedes that the legal fees constitute additional cost for the stock. On brief, respondent asserts that the stock is still the property of petitioner and that 90 per centum of the dividends on the stock was payable to petitioner through Vallina. Neither party placed the contract of sale in evidence. The office manager for petitioner testified that payments on the sales price were based upon the amount of ore removed from the mine and that except for the amount the buyer was to pay, he was not aware of the terms of the contract. He then voluntarily testified that "I believe he was to pay ninety per cent of any *289 dividends received." It is apparent that the voluntary testimony of the witness is no more than an opinion without a factual background - a mere guess. At most, in the face of other evidence, not contradicted, it is no more than a basis for measuring the payments to petitioner. The evidence discloses a sale of the stock and we so find. Respondent contends in the alternative that the cost basis to petitioner after June 1, 1942, was $18,203.54, such amount being one-half of the original cost of $40,087.06 after deducting the amount of $3,679.99 that was deducted as cost in reporting gain on the installment received in 1941. His theory is that each spouse had a community interest in one-half of the remaining cost and since petitioner paid nothing for the basis of his former wife, he did not acquire her basis in the property settlement agreement. He relies, without discussion, on C. C. Rouse, 6 T.C. 908; aff'd, 159 Fed. (2d) 706. In the Rouse case, the husband, pending divorce proceedings, acquired his wife's interest in community property. Later he sold parcels of real estate so acquired and claimed as a basis for computation of gain the cost to the community, on the ground that he acquired *290 the assets in a partition of community property. We held that he acquired the property by purchase, and that his cost constituted his basis in a subsequent sale. We said: "* * * If there were simply a division of the community estate, as petitioner contends, the property would have been equally divided, or at least an attempt would have been made in good faith to achieve an equal division. In that event, where, in exchange for a vested undivided one-half interest in the whole, each party receives a vested interest in the whole of one-half, obviously there would be no resulting taxable gain, and no change in the basis of any of the property by reason of the settlement." * * * Respondent does not specifically contend that petitioner purchased the community interest of his former wife in the property. Such an idea is inferable from the conclusion he asks us to reach. Under the issue involving the sale of ranches in Colorado, he referred to the separation agreement as a "division of communal and separate property * * *," a position opposed to the idea of a sale under this issue. The agreement of June 1, 1942, reveals a bona fide division of their property rights, and not a sale. It recites *291 that the parties thereto "after consulting with their respective attorneys have agreed upon a separation agreement, division of community property and property settlement." In the agreement petitioner acknowledged certain indebtedness of his wife; the various kinds of property to be set aside for each were sufficiently described for transfer and were not valued; each party acknowledged familiarity with the business affairs of the other and quitclaimed any interest in the property going to the other; the wife, in addition, acknowledged "that the settlement and division of community property herein made is a fair and equitable settlement and division of property and accordingly quit claims," etc., and finally that "This agreement shall be and constitute a final property settlement and division of community property between the parties * * *." The instrument does not contain the terms "buy or sell" or other words of like purport or consideration payable for any item or items of property of either party. Nothing suggests the idea that the property was not divided as equally as possible. An agreement, as here, partitioning property does not give rise to taxable gain or deductible loss. *292 Frances R. Walz, Admx., 32 B.T.A. 718. The Rouse case does not support the respondent's view and we are not aware of any authority for such a conclusion. The effect of his position, applied to all property involved in the partition, would be to reduce the basis of all of it by one-half and thereby prevent either party from ever recovering the cost to the community. Such a result would require clear authority to support it. On this issue our holding is for the petitioners. The other issues for decision on the facts are the amounts deductible for interest paid on indebtedness to Eloy S. Vallina and Banco Commercial Mexicano, S. A., in 1941, 1943 and 1944, the year 1944 being involved under the issue raised by petitioner to deduct in 1943 a net loss in 1944. No deduction was claimed by the petitioners in their returns for 1941 for interest paid to Vallina in that year and no issue was raised with respect to the deductibility of the amount. The books of petitioner disclose an interest payment of $6,248.59 on June 1, 1944, but only $4,594.99 was claimed by the petitioner as a deduction in his return for that year. The books of petitioner disclose no indebtedness to Vallina from September *293 9, 1942, when the loan obtained on June 1, 1942, for $5,000 was repaid, to August 15, 1944, when further borrowing commenced. Thus, there is lack of proof of indebtedness to form the basis for a claim for deduction of interest. No contention is made that the amount represents payment of overdue interest. Accordingly, nothing will be allowed as a deduction in 1944 for interest paid to Vallina. Concerning the interest on the indebtedness to Banco, the proof is that of the amounts claimed as deductions in 1941, 1943 and 1944, $458.33, $300, and $2,441.33 were paid in such years, respectively. Respondent concedes, on brief, that $488.33 (correct amount is $458.33) is deductible in 1941, $250 in 1943, and $2,381.31 in 1944. In addition to the amounts conceded by respondent, discount of $50 on the $5,000 loan obtained on May 4, 1943, was paid October 29 of the same year, when the principal was paid, and interest in the amount of $60.02 accrued by petitioner on January 6, 1944, was paid on August 5, 1944. Accordingly, in the Rule 50 computation interest will be allowed in the amount of $458.33 in 1941, $300 in 1943, and $2,441.33 in 1944. Interest Deductions Findings of Fact At all times *294 during 1941 Pantex was indebted to petitioner. The amount at the beginning of the year was $91,008.13. On March 31, 1941, petitioner was indebted to Amtex on his note in the amount of $98,611.93. In 1941 petitioner entered in his books amounts totaling $1,988.66 which Pantex had credited to Amtex for petitioner's indebtedness to the latter for interest payable to petitioner on its indebtedness to him. The amounts so credited by Pantex for petitioner's benefit were included in the return of petitioners for 1941 as interest received. In his return for 1941 petitioner claimed the amount of $1,988.66 as a deduction for interest paid to Amtex. The respondent did not disallow the deduction in his determination of the deficiencies. In 1943 petitioner entered in his journal the amount of $252.12 for interest payable to Pantex. In 1944 he made a like entry for interest due Pantex and George K. Taggart in the amounts of $240.62 and $240.63, respectively, a total of $481.25, none of which was paid in cash. The interest so accrued was deducted from gross income in returns filed by petitioner for 1943 and 1944. Opinion On brief, respondent asks us to disallow as a deduction in 1941 the amount of *295 $1,988.66 claimed by the petitioners in their returns, and allowed by respondent, as interest paid to Amtex. No issue was raised in the pleadings respecting the deduction. Accordingly, we are not in a position to deny the deduction. Concerning the interest involved in the years 1943 and 1944, in the absence of proof that the amounts were paid, petitioner being on the cash basis of accounting and reporting income, the amounts are disallowed as deductions. The amount of petitioner's losses, if any, for carry-back deduction purposes will be computed on the basis of the conclusions reached herein and reflected in the computations under Rule 50. Decisions will be entered under Rule 50. Footnotes
1. Including $42,322.54 due from Harper A. Holt, $7,212.22 from J. Earle Brown, and $5,721.37 from R. L. Shaw. and debited his notes payable account with $1,250 for the shares of stock previously held by Rice M. Tilley in Trinity State Oil Co., Trinity State Pipe Line Corporation, and Centennial Oil Co.↩
1. Accounts charged to him by International Jan. 31, 1937. Including the demand notes Amtex, petitioner and George K. Taggart had sold to Pantex for its class A notes. The liability was eliminated from the books the same day by a charge to notes payable and a credit to notes receivable.
[1]↩ Entered in accounts payable.
1. Amounts charged to F. M. Corzelius on Jan. 31, 1937, by International, and for which he received class A notes from Pantex.
1. Owned by Amtex and Pantex. ↩
2. Accounts charged to F. M. Corzelius by International on January 31, 1937, and sold by him to Pantex on October 22, 1937, for class A notes. ↩
3. Pro rata share of liability as guarantor of class B notes of face amount of $12,000 held by J. Earle Brown. ↩
4. Of the amounts, $191,163.94 was charged to petitioner and George K. Taggart Feb. 17, 1938, on the books of Amtex, one-half to each.↩
1. Purchased from F. M. Corzelius. ↩
2. Issued for assumption of corporate indebtedness.↩
1. For notes issued October 22, 1937, aggregating a like amount. ↩
2. Out of note for $143,000 for assumption of corporate debts on Dec. 15, 1937. ↩
3. $21,004.82 out of purchases from F. M. Corzelius and $44,388.07 out of the note given for assumption of corporate indebtedness.↩
1. Community interest in stock previously held by Geo. K. Taggart. ↩
2. Remainder of stock, 56.25 shares, was held by Amtex as treasury stock.↩
1. Remainder of shares out of 303.125 acquired from F. M. Corzelius on Feb. 15, 1938, after sale of 150 shares on Dec. 27, 1938.
1. Acquired from J. Earle Brown. ↩
2. Acquired from Harper A. Holt. ↩
3. Cost after sale on Dec. 27, 1938, of 16 shares out of 32.33 acquired from F. M. Corzelius Feb. 15, 1938.↩
1. Acquired: 48 shares Oct. 13, 1937 out of original issue. 6.67 shares Nov. 1, 1937 from J. Earle Brown. 10 shares Nov. 3, 1937 from Harper A. Holt. ↩
2. Out of 32.33 acquired from F. M. Corzelius.
1. Includes 2.51 shares acquired from petitioner prior to the liquidation.↩
1. Re-issued for original stock.